```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
STATE OF NEW YORK and ERIN M.
CROTTY, as Trustee of Natural
Resources,

                    Plaintiffs,

          -against-                    MEMORANDUM AND DECISION
                                       02-CV-1358(JS)(MLO)

B.B.& S. TREATED LUMBER CORP.,
B.B.& S. HOLDING CORP., THOMAS
SAMUELS, GEORGE GUILLOZ, and
VINCENT MAUCERI,

                    Defendants.
------------------------------------X
APPEARANCES:
For Plaintiffs:        Pedro Medina, Esq.
                       New York State Department of Law
                       Environmental Protection
                       120 Broadway
                       New York, New York 10271

For Defendants:
B.B.& S. Treated Lumber,
Corp., and B.B.& S.
Holding Corp.          Anthony B. Tohill, Esq.
                       12 First Street
                       P.O. Box 1330
                       Riverhead, New York 11901

Thomas Samuels and
George Guilloz         Stephen R. Angel, Esq.
                       Esseks, Hefter, & Angel
                       108 East Main Street
                       P.O. Box 279
                       Riverhead, New York 11901

Vincent Mauceri        Martha L. Luft, Esq.
                       Patrick Edward Reale, Esq.
                       Twomey, Latham, Shea & Kelly, LLP
                       33 West Second Street
                       P.O. Box 9398
                       Riverhead, New York 11901
```

## **INTRODUCTION**

Pending before the Court are the parties' submitted

findings of fact and conclusions of law. For the reasons below, the Court finds the Defendants' version of the facts more credible and persuasive. Accordingly, the Clerk of the Court shall enter judgment accordingly.

## BACKGROUND

The Court presided over a five-day bench trial on February 12-16, 2007. All parties presented witnesses and exhibits. The parties stipulated to a number of facts in their Joint Pre-Trial Order, filed December 14, 2006, and approved by the Magistrate on December 20, 2006 ("JPTO"). For the basic background facts, the Court refers the parties to the stipulated facts contained in the JPTO. Thus, the only issue before the Court was whether Defendants Thomas Samuels ("Samuels"), George Guilloz ("Guilloz"), and Vincent Mauceri ("Mauceri") (collectively, the "Defendants") were operators subject to liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA").

I. <u>Summary Judgment Order</u>

On March 16, 2006, this Court granted in part and denied in part the parties' motions for summary judgment ("Summary Judgment Order"). In the Summary Judgment Order, the Court granted in its entirety Plaintiffs' motion against B.B.& S. Treated Lumber Corp. and B.B.& S. Holding Corp. ("BB&S"). The Court denied in their entirety the Defendants' motions for summary judgment. As

for Plaintiffs' motion against the individual Defendants, the Court granted Plaintiffs' motion on the second through fifth elements of their CERCLA claim. But the first element – whether the Defendants were operators under CERCLA – was an issue of fact that ultimately became the basis for the bench trial.

II. Applicable Law

Congress enacted CERCLA to ensure that the parties "responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." Prisco v. A&D Carting Corp., 168 F.3d 593, 602 (2d Cir. 1999) (citations omitted). Section 107 of CERCLA "provides a private right of action for the recovery of . . . costs" incurred for "responding to the release or threatened release of 'hazardous substances,'" as defined in CERCLA. Id. (citations omitted); see 42 U.S.C. § 9607. The quantity of the hazardous substance does not matter. Rather, a plaintiff must establish five elements to make out a prima facie case under § 107. See id. A plaintiff must prove the following:

(1) [T]he defendant falls within one of the four categories of potentially responsible parties set forth in § 107 . . . .
(2) The facility is indeed a "facility" as defined by § 101(9) of CERCLA . . . .
(3) [T]here is a release or a threatened release of hazardous substances at the facility. . . .
(4) [T]he plaintiff incurred costs in responding to the release or threatened release ("response costs").
(5) [T]he costs incurred conform to the [NCP].

Id. at 602—03 (citations omitted).

"[A]ny person who at the time of disposal of any

hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable for costs and damages incurred for the release of such hazardous substances. 42 U.S.C. § 9607(a)(2). CERCLA poorly defines an owner and operator of such facility as "any person owning or operating a facility." 42 U.S.C. § 9601(20)(A)(ii). The Supreme Court discussed what constitutes an "operator" for purposes of CERCLA liability. See United States v. Bestfoods, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998). A parent shareholder is not liable under CERCLA unless (1) a plaintiff can pierce the corporate veil or (2) the shareholder "actively participated in, and exercised control over, the operations of the facility . . . ." Bestfoods, 524 U.S. at 55.

A shareholder actively participates in a facility's operations when the shareholder "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. at 66–67. Operating a facility is "more than mere mechanical activation of pumps and valves . . . ." Facility operation includes "the exercise of direction over the facility's activities." Id. at 71.

However, the Supreme Court recognized that a shareholder who merely acts in its investor role is not liable under CERCLA. See id. at 72. "Activities that involve the facility but which are

4

consistent with [a shareholder's] investor status, such as monitoring of the [corporation's] performance, supervision of the [corporation's] finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." Id. (quoting Oswald, Bifurcation of the Owner and Operator Analysis Under CERCLA, 72 WASH. U. L. Q. 223, 282 (1994)). The question then becomes whether "actions directed to the facility . . . are eccentric under accepted norms" of behavior for a shareholder acting solely as an investor. Id. Eccentric behavior for a shareholder includes becoming directly or heavily involved with a facility's environmental and regulatory matters, actively participating and exerting control over environmental matters, or issuing directives on how to respond to regulatory inquiries. See id.

Lower courts have also applied the Bestfoods analysis of a parent corporation shareholder's liability to individual shareholders. See Booth Oil Site Admin. Group v. Safety-Kleen Corp., 137 F. Supp. 2d 228, 239 (W.D.N.Y. 2000); United States v. Green, 33 F. Supp. 2d 203, 217—18 (W.D.N.Y. 1998); City of N.Y. v. N.Y. Cross Harbor R.R. Terminal Corp., 98-CV-7227, 206 U.S. Dist. LEXIS 4238, at *. The Green court found that a shareholder cannot be liable as an operator "unless he directly participated in the management of the facility's pollution control operations including decisions pertaining to the disposal of hazardous substances and

5

compliance with environmental regulations . . . ." Green, 33 F. Supp. 2d at 217. The shareholder must be "actively involved in decision-making concerning environmental compliance or hazardous waste disposal on a regular, ongoing basis." City of N.Y., 2006 U.S. Dist. LEXIS at *41. The shareholder cannot just have "limited or sporadic involvement in environmental compliance issues." Id. at *42.

## **FINDINGS OF FACT**

Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. See Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451-52, 88 L. Ed. 2d 405, 413-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

The Court refers the parties to the stipulated facts in the JPTO and the Summary Judgment Order for factual background information on BB&S, the contamination, and the clean up. The Court's findings of fact below are limited to those facts relevant to the Defendants' liability as operators under CERCLA.

I. <u>Samuels And Guilloz Are Not Operators And Acted More Like Shareholders With An Investor Status.</u>

Thomas Samuels and Charles Guilloz were full-time employees, officers, and shareholders of another company, James H. Rambo ("Rambo"). (Transcript ("Tr.") 261-67.) Samuels and Guilloz did not have offices at the Speonk facility where the contamination took place ("Site") (Tr. 283-84, 378-80.) Samuels and Guilloz lacked any direct or day-to-day involvement in BB&S's treatment plant. (Tr. 281.) They did not hire anybody at the plant. (Tr. 281, 386; S&G's Gladu Dep. Excerpts, p. 24.) They did not supervise anybody at the plant. (Tr. 281, 388.)

Gary Gladu, the plant manager ("Gladu") described his contacts with Samuels and Guilloz generally as seeing them "at the Christmas party or social events. That's about it." (S&G's Gladu Dep. Excerpts, p. 28.) Whereas Gladu reported directly to George Wieser ("Wieser") on a daily basis, multiple times a day, he never spoke with Samuels and Guilloz about "plant operations." (S&G's Gladu Dep. Excerpts, p. 27-28; S&G's Wieser Dep. 7/23/03 Excerpts, p 33.) In fact, during Gladu's entire tenure at BB&S, he only had one meeting with the principals, and that meeting involved his suggestion to put a roof over the drip pad. (S&G's Gladu Dep. Excerpts, pp. 58, 60.)

Samuels and Guilloz did not observe the operation of the plant. (Tr. 281.) They did not have any contacts with a franchisor, Osmose Wood Preserving Co. of America, Inc. ("Osmose") about the plant operations. (Tr. 281, 386-87.) They never

7

received Osmose's training about how to operate the treatment plant. (Ex. 5, p. 2; Tr. 279, 382.) They did not maintain offices, parking spaces, or desks at BB&S, have a secretary at BB&S, or have BB&S business cards, and they were not listed in any BB&S phone directory. (Tr. 283-84, 378-80.) Samuels and Guilloz were never signatories on any of BB&S's bank accounts for the entire period of BB&S's business operations, i.e., from 1971 to 1996 (including before it entered into the treatment operations in 1979). (Tr. 285, 389-90.) For the entire 25-year period of BB&S's operations, including the period of treatment plant operations, Samuels and Guilloz never issued a single letter on BB&S stationery. (Tr. 285, 390.) Samuels and Guilloz received no salary from BB&S but received some distributions. (Tr. 325, 390.)

Samuels and Guilloz never met with SCDHS or NYSDEC representatives regarding BB&S's operations and environmental compliance. (Tr. 217, 398-99; S&G's Gladu Dep. Excerpts, p. 81.[1]) Samuels and Guilloz's names or initials do not exist anywhere on the "BB&S Responsibilities Flow Chart" prepared by George Wieser in or around 1984 to 1985. (Ex. D1; Tr. 258.) Samuels and Guilloz's involvement in BB&S generally consisted of periodic shareholder

---

[1] In fact, no witness from the NYSDEC testified during the trial, and the State could only identify a single meeting that occurred between any NYSDEC representative and Samuels, but that meeting occurred in April 1997, long after BB&S had already ceased its treatment plant operations and sold its assets. (Tr. 362, 368-69; Exs. 17 & 18.)

meetings, which took place about 3 to 4 times per year. (Tr. 281, 390 440-441, 478.) The meetings sometimes happened at BB&S, other times they were just over the phone. (Tr. 391.) At these shareholder meetings, the owners discussed items like sales data and purchasing, account receivables and payables, equipment purchases, and major financial decisions. (Tr. 391-92, 478-79.)

The owners would have a meeting, for example, when a "large project" was to be accomplished (like tearing down the drip pad and constructing the roof over it). (Tr. 210-211.) Wieser described the types of decisions involving all the "principals" as a "higher level of the business," such as "banks or ... future plans for growth..." or "a more sophisticated decision to make that impacted the company maybe on a long-term basis." (Wieser Dep. 7/17/03 Excerpts, pp. 19-20.) Wieser described Samuels and Guilloz's level of responsibilities as "knowing what was going on on a regular basis." (Wieser Dep. 7/23/03 Excerpts, p. 18.) Samuels and Guilloz each were minority shareholders at all relevant times. (Stip. Facts #2, #3; Ex. 9.)

These findings of fact reveal that Samuels and Guilloz acted more like shareholders with an "investor" status rather than "eccentric" shareholders. They did not exercise direct control over the Site's plant operations. Instead, Wieser and Mauceri kept Samuels and Guilloz abreast of BB&S's performance. Samuels and Guilloz might have monitored BB&S's performance in relation to the

9

finance and capital budget decisions, but this does not lead to liability as operators. Aside from some isolated instances, Samuels and Guilloz did not become directly or heavily involved in the Site's environmental or regulatory matters or issue directives on how to respond to regulatory inquiries.

Simply put, Samuels and Guilloz were not operators as defined under CERCLA. Accordingly, the Court finds in favor of the Defendants, Samuels and Guilloz, on the question of whether they were operators subject to CERCLA liability.

## II. Mauceri Oversaw Sales But Not Environmental Matters.

The question as to whether Mauceri was an operator presented a closer call. Mauceri was present at the Site on a more regular and continuous basis. Notwithstanding, Plaintiffs did not meet their burden in providing enough facts to establish operator liability as to Mauceri.

Mauceri was initially the sole manager of BB&S. (Tr. 72.) Mauceri was the sole manager of BB&S. until 1978 when Wieser was hired as a co-manager. (Stipulation of Facts ¶¶ 2, 13). Wieser assumed responsibility for BB&S's yard operations and trucking. (Tr. 274, 312, 408, 456). Mauceri was in charge of sales, generating business and negotiating contracts. (Tr. 462.)

At the time that Wieser was hired, the shareholders agreed that producing its own pressure treated wood would make BB&S more efficient and profitable by eliminating the middle man and

reducing trucking expenses. (Tr. 131, 313, 456.) On behalf of BB&S, Mauceri conducted the negotiations with Osmose to enable BB&S to produce its own pressure treated wood. (Tr. 45-57.) During construction of the wood treatment plant, Mauceri continued to focus his efforts on sales for BB&S of wood that had been pressure treated by third parties. (Tr. 316.)

Mauceri's management responsibilities at BB&S included contract negotiation. (Tr. 457.) He also managed the sales staff, office staff, and truck drivers. (Tr. 467.) Wieser's deposition testimony supports this. Wieser testified at his deposition that Mauceri addressed questions about "production [and] general everyday operations" because he was "in charge more of less [of] the sales staff and whatever had to be done there." (Wieser Dep. 21:10-13.) If the plant manager had to talk about environmental issues, he would talk to Wieser. If it were general everyday operations, the plant manager would talk to Mauceri. (Wieser Dep. 21:8-13.) Even Gladu, the plant manager, testified that Mauceri had "more of the sales responsibilities." (Gladu Dep. 31:1-10.) Wieser dealt with the treatment plant at the Site that ultimately led to the contamination - not Mauceri. (Tr. 464.) And again, Mr. Pim did not know Mauceri; he only dealt with Wieser when it came to the environmental compliance matters.

Based on the findings of fact above, the Court finds that Mauceri was involved with BB&S on a more regular day-to-day

11

basis because he was an employee of BB&S. But his responsibilities were limited to sales, operations, and contract negotiations. Wieser dealt with the treatment plant and the accompanying environmental issues. Wieser reported to the other shareholders when contamination occurred - not Mauceri. (Tr. 319-20.) Even an uninterested witness - Mr. James Pim who worked for the Suffolk County Department of Health Services - testified that he never met with Mauceri - only Wieser. Pim was responsible for controlling the pollution in Suffolk County and dealt specifically with the Site. (Tr. 181-87.) The facts above do not suggest that Mauceri was actively involved in the environmental compliance matters other than in his role as a shareholder.

## CONCLUSION

Based on these findings of fact, Defendants are not operators subject to CERCLA liability. Accordingly, the Court orders the Clerk of the Court to enter judgment in favor of the Defendants. For the judgment against BB&S, the Court orders the parties to appear before Magistrate Judge Michael L. Orenstein to discuss the amount of damages that should be entered for the judgment against BB&S.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
September 30, 2007